UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Colleen M. Kurth,

        Plaintiff,

v.

City of Inkster,
a Michigan Municipal Corporation,
Paul Martin, and Dennis Watkins
Jointly and Severally,

        Defendants.

_____/

Case No. 10-11973

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [12]**

    Plaintiff Colleen M. Kurth filed this action against Defendants City of Inkster and her police department supervisors Paul Martin and Dennis Watkins alleging that Defendants: discriminated against her under the Michigan Elliott-Larsen Civil Rights Act ("ELCRA") and Title VII of the Federal Civil Rights Act ("Title VII") because of her gender; retaliated against her in violation of Title VII for exercising her civil rights; caused her intentional infliction of emotional distress; and engaged in a concert of action and civil conspiracy to terminate her. This matter comes before the Court on Defendants' motion for summary judgment. For the reasons set forth below, Defendants' motion is GRANTED IN PART and DENIED IN PART.

**I.    Facts**

    **A.    Background**

1

On May 28, 2001, the City of Inkster Police Department ("Department") hired Plaintiff as a probationary police officer. (Compl. ¶ 7.) In September, 2004, the Department promoted her to detective, the first woman to hold that position. (Compl. ¶ 8; Pl.'s Resp. at 1.) In her time as detective, Plaintiff received high evaluations and several commendations. (Compl. ¶¶ 9-10.) Plaintiff also received several disciplinary actions. (Defs.' Mot. for Summ J., Ex. K, Arbitration Op. and Award at 15.) Her supervisor was Defendant Paul Martin.[1] (Compl. ¶¶ 8, 11.) In March, 2009, the Department terminated Plaintiff's employment. (Defs.' Mot. for Summ. J., Ex. A, Kurth Dep. at 61.) In October, 2009, the Department reinstated Plaintiff. She currently is employed there. (Defs.' Mot. for Summ. J., Ex. L, H.R. Letter II at 1.)

## B.   Red Jacket Incident

On January 22, 2009, an incident took place that led to Plaintiff's termination and the instant case. (Defs.' Mot. for Summ. J., Ex. B, Martin Dep. at 14-15.) The employees of the Detective Bureau, including Plaintiff and Defendant Martin, were preparing to go on a raid to recover computers from someone suspected of committing identity theft. (*Id.* at 15.) Defendant Martin became aware that Plaintiff was wearing a red jacket.[2] (*Id.* at 17.) According to Plaintiff, Defendant Martin approached Plaintiff and said that she was "not invited" on the raid. (Kurth Dep. at 54.) According to Defendants, "Detective Martin told her to put on the other jacket or not go to the raid." (Defs.' Mot. at 1-2.) In either case, Plaintiff did not put on her other jacket: a lightweight, black, police-issued jacket. (Kurth Dep. at 54.) Some members of the team were wearing other colored jackets but

---

[1] Sergeant S. Adams was Plaintiff's immediate supervisor, Defendant Martin is the supervisor in the Detective Bureau, and the overall supervisor is Lieutenant Jeffrey Smith. (Arbitration Op. and Award, Defs.' Mot. Ex. K at 4.)
[2] The jacket was purchased from a store which served police officers, had police dropdowns, and had "Police" printed on it. (Kurth Dep. at 54; Martin Dep. at 18.)

none were bright colored jackets. (*Id.* at 54-55, 57.) There was no policy requiring employees to wear any particular jacket on the raid. (Defs.' Mot. for Summ. J., Ex. C, J. Smith Memo. at 2.)

Defendant Martin states that he told Plaintiff to wear the standard-issue black jacket out of concern for her safety. (Martin Dep. at 17.) He says that the red jacket could have made Plaintiff a target because an occupant of the raid location could see her through the window and shoot her.[3] (*Id.* at 20.) Plaintiff states that the bright red jacket would not have been a security liability because she was standing outside of the building and it was daytime. (*Id.* at 57.) Lieutenant Kevin Smith concurred with Plaintiff and stated that bright clothing was not an issue during the daytime. (Pl.'s Resp., Ex. A. K. Smith Aff. at ¶ 7.)

In response to the red jacket incident, Plaintiff sent a letter to the Department reporting Defendant Martin's treatment of her. (Defs.' Mot. for Summ. J., Ex. D, Kurth Memo. at 1.) The Human Resources Department conducted an investigation into the Plaintiff's allegations and found that they did not support a hostile environment claim. (Defs.' Mot. for Summ. J., Ex. E, H.R. Letter I at 1.)

Also in response to the incident, Defendant Martin set in motion, but did not conduct, an investigation into Plaintiff's conduct. (Martin Dep. at 27-28.)   Lieutenant Jeffrey Smith investigated and concluded that the Department should give Plaintiff "progressive discipline." (J. Smith Memo. at 3.) Lieutenant Jeffrey Smith found that Plaintiff violated Department rules requiring cooperation by failing to go on the

---

[3] In an earlier raid involving the same suspect, the suspect's mother was sitting on a gun. (Martin Dep. at 15) Plaintiff states that she had worn the jacket on other raids, but not a raid involving the same suspect or a raid under the supervision of Defendant Martin. (Kurth Dep. at 58; Martin Dep. at 19.)

scheduled raid and had committed insubordination by refusing Defendant Martin's order. (*Id.* at 2.) The results of the investigation into Plaintiff's conduct were reviewed by Defendant Dennis Watkins, who recommended that the Department terminate Plaintiff's employment. (Defs.' Mot. for Summ. J., Ex. F, Watkins Memo. at 1-2.) Chief Gregory Gaskin agreed with Defendant Watkins's recommendation and Plaintiff was terminated. (Defs.' Mot. for Summ J., Ex. G, Gaskin Dep. at 11.)

On July 23, 2009, following her termination, Plaintiff and the Department engaged in arbitration proceedings. (Arbitration Op. at 4.) The arbitrators recommended that the Department rehire Plaintiff. (*Id.* at 13-15.) They found that Defendant Watkins's recommendation was based on an inaccurate disciplinary history and because there were mitigating factors. (*Id.*) The mitigating factors were the fact that she had previously worn the same jacket on raids and that there were previous serious instances of insubordination that did not lead to termination. The arbitrators considered that Plaintiff was a long-term employee with a good professional record.[4] (*Id.* at 13-15.) In October, 2009, Plaintiff returned to work. (H.R. Letter II at 1.)

## C.   Earlier Incidents

### 1.  Morality-Decoy Incidents

The red jacket incident was not the first between Plaintiff and Defendant Martin. Plaintiff alleges that Defendant Martin harassed her on a daily basis. (Kurth Dep. at 34.) In September, 2003, Plaintiff began working as a "morality decoy," a police officer posing as a prostitute. (*Id.* at 27.) The decoy's job was to attract clients and then signal

---

[4] As discussed in section I. E. Plaintiff had one suspension removed from her record and another suspension reduced in length.

for the supporting officers to arrest the client. (*Id.*) In the first of two incidents, Plaintiff gave the verbal signal for the supporting officers to come in but Defendant Martin did not respond. (*Id.*) Plaintiff says that Defendant Martin told her he did not see Plaintiff's non-verbal signal although he did hear her.[5] (*Id.*) In the second incident, Plaintiff was again working as a decoy when she gave the non-verbal signal in Defendant Martin's line of sight but he again did not respond. (*Id.* at 30-31.) Plaintiff says that Defendant Martin told her that he did not respond because the would-be customer was on foot and the team was targeting people in automobiles. (*Id.*)

### 2.  Sexist Comment Incident

In September, 2004, Plaintiff alleges that Defendant Martin told her that "women should not be doing police work" and that he "never wanted a woman police officer backing him up." (Compl. ¶¶ 12, 13.) Defendant Martin denies making those statements. (Martin Dep. at 8-9.) Plaintiff reported these statements to the Department and in response, Plaintiff alleges that Defendant Martin took retaliatory and disciplinary actions against her. (Compl. ¶ 16-17.)

### 3.  Additional incidents

There were several other incidents between Plaintiff and Defendant Martin. In 2004, Defendant Martin denied Plaintiff overtime to obtain a search warrant to collect a buccal swab from a suspect.[6] (Kurth Dep. at 34.) Plaintiff said this was discriminatory because Defendant Martin had approved another male police officer for overtime at the same time. (*Id.*) Also in 2004, Defendant Martin asked Plaintiff where her tie was.

---

[5] In his deposition, Defendant Martin said he could not remember the incident. (Martin Dep. at 11.)
[6] A DNA swab from the inside of someone's cheek. (Kurth Dep. at 36.)

(Martin Dep. at 29.) Defendant Martin states that he believed that all detectives were required to wear a tie. (*Id.*) Plaintiff states that the question was "a thinly veiled reference to her gender." (Pl.'s Resp. at 2.) In another incident, Plaintiff alleges that Defendant Martin would regularly comment about Plaintiff's private office and printer. (Kurth Dep. at 85.) Plaintiff states that this was belittling harassment. (*Id.*) In an additional incident, Defendant told Plaintiff that she was not "half the detective" that two of her male colleagues were. (Martin Dep. at 23.) Defendant Martin said this was a reference to her relative inexperience compared to her colleagues. (Defs.' Mot. at 13.)

Plaintiff also supports her argument with incidents she became informed about from other officers in the Department. Lieutenant Kevin Smith states that he heard Defendant Martin make numerous remarks about how women should not be in police work in addition to other discriminatory comments. (K. Smith Aff. at ¶¶ 3-5.) Lieutenant Kevin Smith also states that he heard Defendant Martin exhibit a bias against women generally by saying "women are good for two things, and I can wash my own dishes." (*Id.* at ¶ 3.) Lieutenant Kevin Smith further states that he heard Defendant Martin say on several occasions that he was going to "get rid" of Plaintiff. (*Id.* at ¶ 6.) Officer Anthony Delgreco states that he heard Defendant Martin say that he was going to "mess" with Plaintiff. (Pl.'s Resp., Ex. D. Delgreco Dep. at 6.) Defendant Martin argues that that statement referred to playing tension-easing practical jokes on Plaintiff.[7] (Martin Dep. at 22.) Officer Delgreco however says that Defendant Martin was referring to things for which he could write up Plaintiff. (Delgreco Dep. at 6.)

### D.    Post-Return to Employment Incidents

---

[7] Defendant Martin later denies ever making such a statement. (Martin Dep. at 28.)

After Plaintiff returned to work following arbitration, there were two other incidents involving the common whiteboard that she attributed to Defendant Martin. Plaintiff argues that the incidents further show that Defendant Martin discriminated against her because of her gender. (Pl.'s Resp. at 1.) In the first incident, Defendant Martin wrote "call" next to Plaintiff's name in large letters where Plaintiff's day off was written. (Kurth Dep. at 79.) Plaintiff says that Defendant Martin did not do that to any other employee. (*Id.*) Defendant Martin says he wrote "call" on the board in order to determine who was supposed to be on-call as part of his supervisory role. (Martin Dep. at 25-26.) In the second incident, Plaintiff wrote her name and "polygraph" on the whiteboard to indicate that she was administering a polygraph examination. Underneath these writings, someone wrote "Yours?," suggesting that Plaintiff was taking, or should take, a polygraph examination. (Kurth Dep. at 34; Pl.'s Resp., Ex. E. Whiteboard photo.) Plaintiff alleges that the handwriting was Defendant Martin's. (Kurth Dep. at 34.) Defendant Martin denies that he wrote the statement. (Martin Dep. at 14.)

### E.    Previous Disciplinary Actions

The jacket incident was not Plaintiff's first disciplinary action. On January 4, 2007, Plaintiff was given a written reprimand for insubordination. (Arbitration Op. at 5.) On December 12, 2007, she was given a one-day suspension for willful disobedience of rules and orders and insubordination. (*Id.*) On June 25, 2008, Plaintiff was issued a three-day suspension for falsifying documents, lying or perjury, misfeasance, and insubordination. (*Id.*) In October, 2008, Plaintiff was issued a five-day suspension for "conduct unbecoming and improper use/handling of weapon." (*Id.*) The five-day

suspension was reduced to a four-day suspension and the three-day suspension was overturned and removed from her record. (*Id.*)

On April 1, 2010, Plaintiff filed a complaint against the City of Inkster, Paul Martin, and Dennis Watkins alleging that Defendants engaged in gender discrimination in violations of ELCRA and Title VII and retaliation against Plaintiff in violation of Title VII. (Compl. ¶¶ 37, 41, 58.) Plaintiff's complaint also alleged that Defendants committed the intentional infliction of emotional distress and acted in a concert of action/civil conspiracy to terminate her. (Compl. ¶¶ 26, 33.) Defendants have moved for summary judgment on the sex discrimination and retaliation claims under Title VII and ELCRA and to dismiss the claims of intentional infliction of emotional distress, conspiracy, and concert of action. (Defs.' Mot. for Summ. J. ¶¶ 3-14.)

## II.    Standards of Review

### A.    Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a). A moving party may meet that burden "by 'showing' – that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case."   *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). Revised Rule 56 expressly provides that:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). The revised Rule also provides the consequences of failing to properly support or address a fact:

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
>
> (1) give an opportunity to properly support or address the fact;
>
> (2) consider the fact undisputed for purposes of the motion;
>
> (3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it; or
>
> (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e). "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

When the moving party has met its burden under rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industries Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Ultimately a district court must determine whether the record as a whole presents a genuine issue of material fact, *id.* at 587, drawing "all justifiable inferences in the light most favorable to the non-moving party," *Hager v. Pike County Bd. Of Education*, 286 F.3d 366, 370 (6th Cir. 2002).

## B.    12(b)(6) Motion to Dismiss Standard

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a complaint.  In a light most favorable to the plaintiff, the court must

assume that the plaintiff's factual allegations are true and determine whether the complaint states a valid claim for relief. *See Albright v. Oliver*, 510 U.S. 266 (1994); *Bower v. Fed. Express Corp.*, 96 F.3d 200, 203 (6th Cir. 1996). To survive a Rule 12(b)(6) motion to dismiss, the complaint's "factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint are true." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations and emphasis omitted). *See also Ass'n of Cleveland Fire Fighters v. City of Cleveland, Ohio*, 502 F.3d 545, 548 (6th Cir. 2007). "[T]hat a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of all the elements of a cause of action, supported by mere conclusory statements do not suffice." *Ashcroft v. Iqbal*, ___ U.S. ___, 129 S. Ct. 1937, 1949 (2009) The court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 1950 (internal quotation marks and citation omitted). Moreover, "[o]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief." *Id.* (internal quotation marks and citation omitted). Thus, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-

pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* In sum, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Id.* at 1949 (internal quotation marks and citation omitted).

## III.   Analysis

In her complaint, Plaintiff alleges sex discrimination in violation of ELCRA and Title VII in the form of a hostile work environment, disparate treatment, and a mixed motive termination, retaliatory discrimination in violation of Title VII, intentional infliction of emotional distress, civil conspiracy, and concert of actions. The Court will address each of these claims.

### A.   Sex Discrimination Claims

Title VII and the ELCRA both forbid employment discrimination on the basis of sex.[8] 42 U.S.C.2000e-2(a)(1); Mich. Comp. Laws § 37.2102; Mich. Comp. Laws § 15.361, et seq. Plaintiff alleges that Defendants have committed employment discrimination on the basis of sex when they created a hostile work environment, engaged in disparate treatment, and decided to terminate Plaintiff on the partial basis of her sex.

---

[8] Courts analyze claims of discrimination brought pursuant to the ELCRA under the same evidentiary framework as similar claims brought under Title VII, and Michigan courts follow federal civil rights case law to interpret these claims. *Jackson v. Quantex Corp.,* 191 F.3d 647, 658 (6th Cir. 1999); *see also Sniecinski v. Blue Cross & Blue Shield of Mich.,* 666 N.W.2d 186, 192-95 (Mich. 2003); *Humenny v. Genex Corp.,* 390 F.3d 901, 906 (6th Cir. 2004).

Although sexual harassment claims under Title VII and Michigan's ELCRA have some important differences, those differences are not dispositive here. For example, "unlike Michigan's ELCRA, Title VII applies different standards for evaluating whether the employer as a whole is vicariously liable for the hostile work environment," depending upon whether the employee is harassed by a co-worker or a supervisor. *Clark v. United Parcel Svc., Inc.,* 400 F.3d 341, 349 (6th Cir. 2005). This is not dispositive in this matter because Defendants argue that Plaintiff cannot establish an essential element of her claim under Title VII or ELCRA.

1.      **Plaintiff has not shown that Defendants created an actionably hostile work environment**

Plaintiff alleges that Defendants created an actionably hostile work environment because Defendant Martin constantly harassed her. (Pl.'s Resp. at 7-8.) "In order to establish a prima facie case of a hostile work environment, a plaintiff must show that: (1) she is a member of a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based on her sex; (4) the harassment created a hostile work environment; and (5) the employer is vicariously liable." *Clark v. United Parcel Serv., Inc.,* 400 F.3d 341, 347 (6th Cir. 2005). The requirements under ELCRA are substantially the same.[9]

"In determining whether the alleged harassment is sufficiently severe or pervasive ... the court must consider the totality of the circumstances." *Williams v. Gen. Motors Corp.,* 187 F.3d 553, 562 (6th Cir. 1999). *See also id.* at 564 ("[A] work environment viewed as a whole may satisfy the legal definition of an abusive work environment, for purposes of a hostile work environment claim, even though no single episode crosses the Title VII threshold."). "Isolated incidents, however, unless extremely serious, will not amount to discriminatory changes in the terms or conditions of employment." *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000) "Among the factors to be considered are 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work

---

[9] "(1) [T]he employee belonged to a protected group; (2) the employee was subjected to communication or conduct on the basis of sex; (3) the employee was subjected to unwelcome sexual conduct or communication; (4) the unwelcome sexual conduct or communication was intended to or in fact did substantially interfere with the employee's employment or created an intimidating, hostile, or offensive work environment; and (5) respondeat superior." *Chambers v. Trettco, Inc,* 614 N.W.2d, 910  915 (Mich. 2000) (quoting *Radtke v. Everett,* 501 N.W.2d 155, 162 (Mich. 1993).

performance.'" *Clark*, 400 F.3d at 351 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). "[T]he test for a hostile work environment has both objective and subjective components." *Williams*, 187 F.3d at 566. In order to be actionable, the environment must be one "that a reasonable person would find hostile or abusive," and the employee must "subjectively perceive the environment to be abusive." *Harris*, 510 U.S. at 21-22. "The plaintiff must show that the working environment was both objectively and subjectively hostile." *Clark*, 400 F.3d at 351.

### a.   Plaintiff has not shown that most of the conduct was based on sex

Defendants assert that Plaintiff was not subjected to harassment based on sex. (Defs.' Mot. at 12.) The Sixth Circuit has held that "the conduct underlying a sexual harassment claim need not be overtly sexual in nature" to be "based on sex" in violation of Title VII. *Williams v. Gen. Motors Corp.,* 187 F.3d 553, 565 (6th Cir. 1999). But "[n]on-sexual conduct may be illegally sex-based and properly considered in a hostile environment analysis" only "where it can be shown that but for the employee's sex, he would not have been the object of harassment." *Bowman,* 220 F.3d at 464 ("litany of perceived slights and abuses" subsequent to supervisor's unwelcome sexual advances "[could] not be considered in hostile environment analysis because [plaintiff] ha[d] not shown that [it] was based upon his status as a male"); *see also Morris v. Oldham County Fiscal Court,* 201 F.3d 784, 790-91 & n. 7 (6th Cir. 2000) (same); *Williams,* 187 F.3d at 565 (non-sexual harassment directed at female employee could be considered as part of hostile work environment claim because accompanied by comments evidencing "anti-female animus" (internal citation omitted)).

13

Defendants argue that the only sex-based conduct is Defendant Martin's alleged statement to Plaintiff that he believes women should not be in police work and he would not want a woman to back him up. (*Id.*) Defendants assert that none of the other conduct was directed at Plaintiff because of her sex. (*Id.*) Specifically, Defendants state that:

- The red jacket incident was prompted by concerns for Plaintiff's and others' safety and was not harassment.

- Denial of overtime was a supervisory function not related to harassment.

- Writing "Call" under Plaintiff's name was likewise a supervisory function unrelated to harassment.

- Defendant Martin did not write "Yours" on the whiteboard of a scheduled polygraph test and argues that even if he did, it would only be uncivil.

- Commenting on Plaintiff's printer and private office was not based on sex animus.

- Telling Plaintiff she was not "half the detective" as two of her male colleagues was not based on sexual animus. (*Id.* at 12-13.)

Plaintiff disputes Defendants' characterization of the above incidents and asserts that they were harassing and based on sex discrimination. (Pl.'s Resp. at 6-7.) Plaintiff asserts that other evidence supports her contention that she was subjected to an actionable hostile work environment because of her gender, namely that:

- Defendant Martin, in the presence of Lieutenant Kevin Smith as alleged by Smith in his affidavit, stated numerous times that he was biased against women in

14

general, women in police work especially, and Plaintiff in particular. (K. Smith Aff. at ¶¶ 3-4.)

- When Lieutenant Kevin Smith confronted Defendant Martin, he states that Defendant Martin admitted his intention to get rid of Plaintiff and admitted making discriminatory remarks about her. (*Id.*)

- Defendant Martin stated in the presence of Detective Delgreco that he wondered how he could "get [Plaintiff]," meaning what he could write her up for. (Delgreco Dep. at 6.) Detective Delgreco does not recall Defendant Martin making the same statements about other detectives. (*Id.*) Detective Delgreco states that after he testified in support of Plaintiff at her arbitration hearing, Defendant Martin threatened his future job prospects. (Delgreco Dep. at 9.)

- Plaintiff alleges that Defendant Martin put her in danger twice when she posed as a prostitute by ignoring her signals for the supporting officers to respond. (Kurth Dep. at 27-32.)

- Defendant asked Plaintiff where her tie was. (Martin Dep. at 29.)

Because this is a summary judgment motion, the Court will draw "all justifiable inferences in the light most favorable to the non-moving party." *Hager*, 286 F.3d at 370. The Court finds that only three examples of Defendant Martin's conduct could be construed as harassment based on sex: (1) stating that he does not think women should be doing police work; (2) asking Plaintiff where her tie was; and (3) making numerous discriminatory remarks in the presence of Lieutenant Kevin Smith about women in general, women in police work, and Plaintiff.

The Court does not find sufficient evidence that the other conduct at issue would not have occurred "but for the employee's sex." *Bowman*, 220 F.3d at 464. The other conduct does not show a discriminatory animus unless the Court accepts Plaintiff's circular reasoning that the existence of the incidents themselves shows that animus. See *Bowman,* 220 F.3d at 464 ("litany of perceived slights and abuses" subsequent to supervisor's unwelcome sexual advances "[could] not be considered in hostile environment analysis because [the plaintiff] ha[d] not shown that [it] was based upon his status as a male"). Specifically, there was no evidence that writing "Call" on the whiteboard, asking Plaintiff to change out of red coat or telling her she was "not invited" on the raid, commenting on the Plaintiff's printer, commenting on Plaintiff's experience compared to other Detectives, writing "Yours" underneath Plaintiff's scheduled polygraph examination, and ignoring Plaintiff's signals when she was working as a 'morality decoy' was related to her gender. Similarly, there was no evidence that the denial of overtime was because of Plaintiff's sex despite another male detective's approval for overtime because they were performing different activities and there was nothing linking the denial to sex animus.

### b.    Plaintiff failed to show that an actionable "hostile environment" was created

Defendants argue that Plaintiff has not established that the conduct constituted an actionable hostile environment. (Defs.' Mot. at 13.) The Supreme Court has recognized that "[t]he prohibition of harassment on the basis of sex requires neither asexuality nor androgyny in the workplace; it forbids only behavior so objectively offensive as to alter the conditions of the victim's employment." *Oncale v. Sundowner Offshore Servs.,* 523 U.S. 75, 81 (1998). *See also Burlington Northern & Santa Fe Ry.*

16

*v. White,* 548 U.S. 53, 68 (2006) ("Title VII, we have said, does not set forth a general civility code for the American workplace."). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton,* 524 U.S. 775, 778 (internal quotations and citations omitted). Such a limitation is required "to ensure that courts and juries do not mistake ordinary socializing in the workplace-such as male-on-male horseplay or intersexual flirtation-for discriminatory conditions of employment." *Oncale,* 523 U.S. at 81. Thus, courts should "filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Faragher,* 524 U.S. at 788 (internal quotation marks omitted).

Considering the totality of the circumstances, the frequency, severity, physically threatening or humiliating nature, level of offensiveness, and interference with Plaintiff's employment, and applying the objective and subjective reasonableness test, the Court concludes that Plaintiff has failed to satisfy the fourth requirement of a hostile work environment.

The tie incident and Defendant's alleged statement that he did not think women should be police officers both occurred in 2004. (Compl. ¶ 12, 13; Martin Dep. at 29.) Defendant Martin's statement regarding women in the police force is not sufficiently offensive enough to rise above a "mere offensive utterance," which was not intended to be protected under Title VII. *See Crawford v. Medina General Hosp.*, 96 F.3d 830, 836 (6th Cir. 1996) (finding, in an age discrimination suit, that "while a supervisor's opinion that women should retire at age 55 may be unenlightened and logically indefensible, it

17

hardly rises even to the level of an 'offensive utterance,' as it is simply one person's opinion, susceptible to retort and dispute."). It is unclear from the record how frequently Defendant Martin allegedly said discriminatory comments in the presence of Lieutenant Kevin Smith. Even if the Court assumed that Defendant Martin's comments to Lieutenant Kevin Smith were fairly regular, because they were made outside of Plaintiff's presence, they carry less weight regarding their offensiveness than if they were made her presence. *See Ladd v. Grand Trunk Western R.R., Inc.*, 552 F.3d 495, 501 (6th Cir. 2009) ("'sex-based comments need not be directed at a plaintiff to constitute conduct violating Title VII ... [but] this fact contributes to our conclusion that the conduct here was not severe enough'") (internal citations omitted).

Even if Plaintiff established that all of the above conduct was harassment based on sex, the Court still finds that considering the "totality of the circumstances," the harassment would not be continuous, severe, physically threatening or humiliating, offensive, and disruptive enough to constitute an actionable hostile work environment. *Williams*, 187 F.3d at 562. Plaintiff alleged eight incidents by Defendant Martin in her presence over eight years.[10] Plaintiff also alleged that there were several statements made by Defendant Martin out of her presence that contributed to an actionable hostile environment.

Although the conduct in total is more serious than the three incidents based on sex, it still does not create an actionable hostile environment. First, with the exception of

---

[10] Between when Plaintiff was hired to the filing of her complaint: (1) Defendant Martin stating that he did not think women should be police officers(2) The jacket incident; (3) Denial of overtime; (4) Writing "Call" under Plaintiff's name (5) writing "Yours" on the whiteboard under plaintiff's polygraph test listing; (6) Commenting on Plaintiff's printer (7) Telling Plaintiff that she not as good a Detective as some of her male colleagues; (8) Ignoring Plaintiff's signal for support while she was posing as a morality decoy.

the statements made in front of Lieutenant Kevin Smith, Defendant Martin's actions lack the continuous nature of conduct that is sufficient to constitute a hostile work environment. *Mahan v. Peake,* No. 07-15223, 2009 WL 174130, at *6 (E.D. Mich. Jan. 23, 2009) (Edmunds, J.) ("With the exception of [Defendant]'s manner of sitting down at weekly meetings, his actions lack the continuous nature of conduct the Sixth Circuit has deemed sufficient to constitute a hostile work environment."). Second, even taken together, Defendant Martin's alleged harassment lack the requisite severity. *Id.* (citing *Hawkins v. Anheuser-Busch, Inc.,* 517 F.3d 321, 334 (6th Cir. 2008) (plaintiff survived summary judgment on issue of whether harassment severe or pervasive when supervisor "made regular crass and sexual references to her private body parts, requested oral sex in graphic terms, and solicited sex from her on multiple occasions," "regularly attempted to touch her while they worked on the line," "rubbed against her with his private parts," and "tried to grab her waist"). Finally, Plaintiff has not alleged interference with work performance excluding a one-time denial of overtime, not being allowed to go on the raid, and a brief lack of support when she worked as a morality decoy. These are not severe and pervasive enough to constitute an actionable hostile environment.

Because the Court finds that Plaintiff cannot satisfy the fourth prong of the hostile work environment requirements, the Court will not examine whether Plaintiff satisfied the remaining prong. The Court therefore GRANTS Defendants' motion for summary judgment as to Plaintiff's hostile environment claim.

### 2.     Disparate Treatment Claim

Plaintiff alleges that she was "subjected to different terms and conditions of her employment ... and discriminatory treatment on the basis of her sex."[11] (Compl. ¶ 46.)

### a.    Prima Facie Case of Disparate Treatment

To establish a prima facie case of a gender discrimination in the form of disparate treatment under either Title VII or the ELCRA, a plaintiff must show that he or she was: (1) a member of a protected class; (2) subject to an adverse employment action; (3) qualified for the job; and (4) treated differently than similarly situated male employees for the same or similar conduct. *Humenny,* 390 F.3d at 906; *Hazle v. Ford Motor Co.,* 628 N.W.2d 515, 521 (Mich. 2001). These requirements also apply to Plaintiff's ELCRA claim.[12]

A plaintiff can establish the prima facie case through direct or indirect evidence. "Direct evidence is evidence that proves the existence of a fact without requiring any inferences." *Rowan v. Lockheed Martin Energy Sys., Inc.,* 360 F.3d 544, 548 (6th Cir. 2004). Plaintiff argues that she can produce direct evidence that gender affected the decision to terminate her employment. (Pl.'s Resp. at 8.) The Court finds however, that Plaintiff has failed to introduce direct evidence of disparate treatment.

Because Plaintiff is using indirect evidence, the court analyzes her claim under the *McDonnell-Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1971). *See Graham v. Ford,* 604 N.W.2d 713, 717 (Mich. Ct. App. 1999).

---

[11] Although Plaintiff did not address the disparate treatment claim in her Response to Defendants' Motion for Summary Judgment, it was alleged in the Complaint and the Court will address it. (Compl. ¶¶ 46, 53).
[12] Under the ELCRA "a plaintiff may establish a prima facie case of employment discrimination by showing (1) that the plaintiff was a member of a protected class, (2) that an adverse employment action was taken against the plaintiff, (3) that the plaintiff was qualified for the position, and (4) that the plaintiff was replaced by one who was not a member of the protected class." *Feick v. County of Monroe,* 229 Mich.App. 335, 582 N.W.2d 207, 209-10 (Mich. Ct. App. 1998).

The *McDonnell-Douglas* burden-shifting framework consists of three stages. The plaintiff must first demonstrate a prima facie case of discrimination. *See Clack v. Rock-Tenn Co.,* 304 F. App'x. 399, 402 (6th Cir. 2008). If the plaintiff makes this showing, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the challenged employment action. *See Johnson v. Univ. of Cincinnati,* 215 F.3d 561, 573 (6th Cir. 2000). After the employer articulates a legitimate, non-discriminatory reason, the plaintiff must come forward with admissible evidence showing that the employer's proffered explanation is simply a pretext for unlawful discrimination. *See id.* The business judgment of the employer may not be questioned because the issue is not whether the decision was wrong or mistaken, but whether the decision was discriminatory. *See Hartsel v. Keys,* 87 F.3d 795, 801 (6th Cir. 1996).

### b. Plaintiff cannot establish a prima facie case of disparate treatment

Defendants argue that Plaintiff's disparate treatment claim fails because Plaintiff did not present evidence that she was treated differently than similarly situated employees or that she was replaced by a male employee. (Defs.' Mot. at 8.)

Plaintiff has satisfied the first three elements of a prima facie case of sex discrimination because she is a member a protected class, subject to an adverse employment action, and has alleged that she is qualified for her position. The Court however is not satisfied that that Plaintiff has satisfied the fourth requirement of a prima facie case of disparate treatment, that she was replaced by a man or treated differently than a similarly situated man.

To prove that she was treated differently than a similarly situated man, a plaintiff must show that a male employee in a substantially similar position was treated differently. *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992) ("[T]o make a comparison of a discrimination plaintiff's treatment to that of non-minority employees, the plaintiff must show the 'comparables' are similarly-situated *in all respects.*) (emphasis in original) (citing *Stotts v. Memphis Fire Dept.*, 858 F.2d 289 (6th Cir. 1988). Plaintiff states that other male members of the Department attending the raid were wearing non-regulation jackets including a black leather jacket, a navy blue jacket in the same model as hers, and a light blue denim jacket. (Kurth Dep. at 54-57.) There is nothing in the record suggesting that those male employees were asked to change into the standard issue black windbreaker.[13] (Kurth Dep. at 57.)

Their cases are distinguishable from Plaintiff's under the similarly-situated requirement because (1) none of the jackets worn by the male employees on the raid were bright colored and (2) none of the male employees disobeyed an order to change into the standard issue jacket and were disciplined differently than Plaintiff.

The Court agrees with Defendants that Plaintiff has failed to allege that Defendants treated her differently than similarly situated employees. Plaintiff has thus failed to allege a prima facie case of disparate treatment. The Court therefore GRANTS Defendants' motion for summary judgment as to Plaintiff's disparate treatment claims.

        **c.    Defendants can show that there was a legitimate, non-discriminatory reason for terminating Plaintiff**

---

[13] The record does suggest that Defendant Martin asked all personnel to wear "proper clothing" with "police" displayed but not that he ordered everyone to wear the standard issue windbreaker. (J. Smith Memo. at 2; Watkins Memo. at 1).

22

Assuming that Plaintiff proved a prima facie case of gender discrimination, the burden would then shift to Defendants to articulate a legitimate, non-discriminatory reason. *McDonnell-Douglas Corp.,* 411 U.S. at 802. *See also Grace v. USCAR*, 521 F.3d 655, 677 (6th Cir. 2008). Defendants argue that Plaintiff's refusal to change out of her red jacket on the day of the raid was a legitimate, non-discriminatory reason. (Defs.' Mot. at 9.) The Court finds that Defendants have satisfied their burden because termination for disobeying an order is a legitimate non-discriminatory reason. *See Holden v. Owens–Illinois, Inc.,* 793 F.2d 745, 753 (6th Cir.), *cert. denied,* 479 U.S. 1008 (1986) ("An employee is not protected by Title VII when he violates legitimate company rules, knowingly disobeys company orders, disrupts the work environment of his employer or willfully interferes with the attainment of the employer's goals.").

### d. Even if Plaintiff could show pretext, she would still fail to prove the prima facie case of disparate treatment

Assuming that Defendants demonstrated that there was a legitimate, non-discriminatory reason for Plaintiff's termination, the burden shifts back to the Plaintiff to show that the reason was pretext. *Univ. of Cincinnati*, 215 F.3d at 573. Plaintiff can show pretext and refute Defendants articulated reason by showing that "the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Johnson v. Kroger Co.,* 319 F.3d 858, 866 (6th Cir. 2003) (internal quotation and citation omitted). Plaintiff "may also demonstrate pretext by offering evidence which challenges the reasonableness of the employer's decision to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation." *White v. Baxter Healthcare Corp.,* 533 F.3d 381, 393 (6th Cir. 2008)

23

(internal quotation and citation omitted). "Regardless of which option is used, the plaintiff retains the ultimate burden of producing sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that the defendant [ ] intentionally discriminated against [her]." *Kroger Co.,* 319 F.3d at 866 (internal quotation and citation omitted).

Plaintiff argues that Defendant's proffered reason has no basis in facts because of the difference in each party's version of what happened. Plaintiff further argues that the proffered reason did not motivate Defendants' decision because of the nature of the request (asking Plaintiff to wear a windbreaker in cold weather). Plaintiff lastly argues that her reinstatement by the arbitrators shows that the asserted reason was insufficient to warrant the challenged conduct. (Pl.'s Resp. at 10-11.)

In support of her argument, Plaintiff cites Lieutenant Kevin Smith's affidavit that the asserted reason is a "sham" because bright-colored clothing is not a security risk during the day. (K. Smith Aff. at ¶ 7.) Plaintiff also cites Lieutenant Jeffrey Smith's finding that she was not "belligerently insubordinate." (Pl.'s Resp. at 11; J. Smith Memo. at 2.) Plaintiff argues that Lieutenant Jeffrey Smith's memorandum demonstrates that her termination was pretext because it describes her complaint to the Department about Defendant Martin as an attempt to "shield herself from any disciplinary ramifications . . . and possibly lay a foundation for adverse legal action." (*Id.*)

Defendants argue that Plaintiff cannot show that the decision to terminate Plaintiff was pretext. (Defs.' Mot. at 9.) Defendants argue that Plaintiff's reinstatement by the arbitrator is not evidence of pretext because the arbitrator found that Defendant

Martin had issued a reasonable order. (Defs.' Reply at 5.) Defendants state that the arbitrator instead reversed because the original decision to terminate was based on an incorrect disciplinary history. (*Id.* at 6.)

Although the Court is inclined to say that there is a material question of fact whether the decision to terminate Plaintiff was pretext because Plaintiff asserts that she was never ordered to change her jacket, the issue is not dispositive because the Court finds that Plaintiff failed to allege a prima facie case of disparate treatment.

### 3.   Plaintiff has shown that her gender could have been a motivating factor in her termination

Plaintiff alleges Defendants were at least partially motivated to terminate her because of her gender. (Compl. ¶ 60; Pl.'s Resp. at 9.) "[A]n unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was *a* motivating factor for any employment practice, even though other factors also motivated the practice." (42 U.S.C. § 2000e-2(m)) (emphasis added). To prove a mixed motive claim under Title VII, a plaintiff must show:

(1) The defendant took an adverse employment action against the plaintiff; and
(2) "race, color, religion, sex, or national origin was *a* motivating factor" for the defendant's adverse employment action.

*White*, 533 F.3d at 400. For the purposes of a summary judgment motion, a plaintiff can use direct or circumstantial evidence. *Id.* (citing *Desert Palace, Inc. v. Costa,* 539 U.S. 90, 99-100 (2003).

### a.   There was an adverse employment action by Defendants

Here, Defendants terminated Plaintiff – this termination is an adverse employment action. Plaintiff argues that Defendants Watkins and Martin both took

action that led to her termination. (Pl.'s Resp. at 9.) Plaintiff alleges that but for Defendant Martin's alleged discriminatory bias, there would not have been disciplinary action for Defendant Watkins to impose and that Defendant Watkins also had a discriminatory bias. (Pl.'s Resp. at 9.) Plaintiff also argues that despite Chief Gaskins' supervising role in terminating Plaintiff's employment, Defendant Watkins made the actual decision. (Pl.'s Resp. at 9.)

Defendants argue that even if Defendant Martin acted out of a discriminatory animus, "any causal link between such animus and Plaintiff's ultimate termination was broken when the employer conducted its own investigation of the charges against Plaintiff. (Defs.' Reply at 4.) Lieutenant Jeffrey Smith conducted the investigation. (J. Smith Memo. at 2.) Defendants state that Lieutenant Jeffrey Smith does not have bias against Plaintiff. (Defs.' Reply at 4.) Defendants dispute whether  there is any evidence that Defendant Watkins had a discriminatory animus towards Plaintiff because of her sex. (Defs.' Reply at 5.) Defendants argue that Chief Gaskin is the ultimate decision-maker regarding Plaintiff's termination. (Defs.' Mot. at 18.)

The Court is satisfied that Defendants were involved in the adverse employment action because Defendant Martin's conduct precipitated her termination, Defendant Watkins recommended termination, and the City of Inkster employed both of them.

### b. Plaintiff has shown that there is a material question of fact whether her gender was a motivating factor in her termination

Plaintiff argues that "Defendant Martin's discriminatory bias against Detective Kurth was an underlying motivating factor" in the decision to terminate her. (Pl.'s Resp.

at 9.) Plaintiff also argues that Defendant Watkins was biased against Plaintiff. (Delgreco Dep. at 10.)

Defendants argue that the record does not show any evidence that Plaintiff's sex was a motivating factor in the decision to terminate her. (Defs.' Mot. at 18.)  Defendants distinguish this case from *White*, because there the supervisor who made the offensive remarks was the one making the adverse employment decision and in this case Defendant Martin made the offensive remarks and he was not involved in the decision to terminate Plaintiff. (Defs.' Mot. at 19.) Defendants also argue that the thorough investigation into the jacket incident shows that the decision to terminate Plaintiff's employment was not based on gender animus. (Defs.' Mot. at 19.)

The investigation of the red jacket incident was conducted by Lieutenant Jeffrey Smith who had witnessed the incident. (J. Smith Memo. at 2.) He found that Plaintiff had been given an order to change jackets and that she refused to do so. (*Id.*) He recommended progressive discipline to Defendant Watkins. (*Id.* at 4.) Defendant Watkins' memorandum to Chief Gaskin recommended that the Department terminate Plaintiff's employment. (Watkins Memo. at 2.) In the memorandum, Defendant Watkins stated that the Plaintiff refused to wear the standard issue jacket and that all personnel were "informed to wear proper clothing with 'police' displayed." (*Id.* at 1.) Chief Gaskin agreed with Defendant Watkins and recommended Plaintiff's termination. (Gaskin Dep. at 9, 11.)

Determining an employer's motive to terminate an employee "will generally be difficult to determine at the summary judgment stage." *Singfield v. Akron Metro. Hous. Auth.,* 389 F.3d 555, 564 (6th Cir. 2004). The *White* court stated that the plaintiff's

"burden of producing evidence to support a mixed-motive claim is not onerous and should preclude sending the case to the jury only where the record is devoid of evidence that could reasonably be construed to support the plaintiff's claim.") *White*, 533 F.3d at 400. Plaintiff argues that Defendant Watkins was biased against her and shared Defendant Martin's desire to terminate Plaintiff's employment. (Pl.'s Resp. at 9.) Applying the *White* standard, the Court finds that there is a material question of fact whether the decision to terminate Plaintiff's employment was motivated by her gender. The Court therefore DENIES Defendants' motion for summary judgment as to Plaintiff's mixed motive claims.

### B.     Plaintiff has failed to prove a prima facie case of retaliation

Plaintiff states that there is a genuine issue of material fact whether her employment termination was retaliatory. (Pl.'s Resp. at 6.) Plaintiff alleges that she was retaliated against for submitting a complaint to the Department about "her hostile work environment, improper conduct or communications towards her by Defendant Martin and of his continual and unlawful discriminatory treatment on the basis of her sex (gender)." (Compl. ¶ 47.) Plaintiff says she was retaliated against through "improper, incorrect and unlawful levels of discipline . . . on the basis of her sex (gender)" and ultimately had her employment terminated in retaliation. (Compl. ¶¶ 48-49.) Defendants argue that Plaintiff's retaliation claim must be dismissed because it does not satisfy element one, three, and four of a prima facie case of retaliation. (Defs.' Mot. at 15-18.)

To prove a prima facie case of retaliation a plaintiff must prove that "(1) she engaged in activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the

28

plaintiff, *or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor*; and (4) there was a causal connection between the protected activity and the adverse employment action *or harassment*." *Morris v. Oldham County Fiscal Ct.*, 201 F.3d 784, 792 (6th Cir. 2000) (emphasis in original).

### 1.    Plaintiff did engage in protected activity

Title VII protects an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C.A. § 2000e-3(a). *See Barrett v. Whirlpool Corp.,* 556 F.3d 502, *516* ("an employee has engaged in opposing activity when she complains about unlawful practices to a manager, the union, or other employees."). A plaintiff can prevail on a retaliation claim even if her complaint is not found to be true as long as the plaintiff has "reasonable and based on a good-faith belief that the employer was acting in violation of Title VII." *Barrett* 556 F.3d at 516; *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579-580. (6th Cir. 2000) ("A violation of Title VII's retaliation provision can be found whether not the challenged practice ultimately is found to be unlawful.").

Plaintiff alleges that she is protected from retaliation for her intra-office memorandum to Lieutenant Jeffrey. (Defs.' Mot., Ex. D.) Plaintiff's memo alleged that Defendant Martin was discriminating against her and creating a hostile work environment. (Kurth Memo. at 1.) Defendant argues that Plaintiff's complaint was not protected because she cannot "demonstrate that her opposition was reasonable and

based on a good-faith belief that the employer was acting in violation of Title VII." (Defs.' Mot. at 15.) (quoting *Barrett* 556 F.3d at 516).

Viewing the facts in the light most favorable to the non-moving party, it can reasonably be inferred that Plaintiff did have a good faith belief that the jacket event was part of a discriminatory pattern. The Court finds that Plaintiff engaged in protected activity.

### 2.    Defendants engaged in an adverse employment action

Defendant argues that Plaintiff's retaliation claim must be rejected because she cannot show a hostile work environment. (Defs.' Mot. at 16.) However, the relevant prima facie requirement of retaliation states that the plaintiff must show that "[the] defendant thereafter took adverse employment action against the plaintiff, *or* the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor." *Morris*, 201 F.3d at 792 (emphasis added). Plaintiff states that the termination of her employment is "sufficiently severe to be actionable." (Pl.'s Resp. at 12.).

An adverse employment action in the retaliation context is different than that in the discrimination context:

> In contrast to Title VII's discrimination provision, the "adverse employment action" requirement in the retaliation context is not limited to an employer's actions that affect the terms, conditions, or status of employment, or those acts that occur in the workplace. The retaliation provision instead protects employees from conduct that would have "dissuaded a reasonable worker from making or supporting a charge of discrimination."

*Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 720 (6th Cir. 2008) (citing *Burlington N. & Santa Fe Ry. v. White,* 548 U.S. 53 (2006)). The Court finds that terminating Plaintiff's

employment would have dissuaded a reasonable worker from reporting discrimination and thus Plaintiff has satisfied the second prima facie requirement.

### 3. Plaintiff has not shown a causal connection between protected activity and the adverse employment action

"In order to show a causal connection, a plaintiff must produce sufficient evidence from which an inference can be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action." *Allen v. Michigan Dep't of Corrections,* 165 F.3d 405, 413 (6th Cir. 1999). In some circumstances, a causal connection can be demonstrated though temporal proximity:

> Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation. But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.

*Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). *See also Johnson v. City of Flint*, No. 09-11805, 2010 WL 1957208, at *10 (E.D. Mich. May 13, 2010) (Edmunds, J.) (a lapse of fourteen weeks is insufficient to prove a causal connection based on temporal proximity alone); *Galenski v. City of Dearborn*, 690 F.Supp.2d 603, 621 (E.D. Mich. 2010) (Edmunds, J.) (nine weeks insufficient).

Defendants argue that Plaintiff cannot show a causal connection between any protected activity and the adverse employment action.[14] (Defs.' Mot. at 17.) Defendants

---

[14] Defendants argues that the alleged protected activities are Plaintiff's verbal complaints to Lieutenant Kevin Smith regarding Defendant Martin's behavior and three written complaints in response to: (1) Martin's alleged statement regarding women in the police force; (2) the jacket incident; and (3) writing "call" and "yours" on the whiteboard. (Defs.' Mot. at 16 n. 4). As discussed earlier, Plaintiff argues protected activity is the complaint about the red jacket incident and the court agrees.

argue that the jacket incident and Plaintiff's subsequent complaint merely coincided with and had no impact on the decision to terminate plaintiff's employment. (*Id.*)

Plaintiff states that there is a causal connection that is demonstrated by the temporal proximity of her complaint and her termination and a statement by Lieutenant Jeffrey Smith's statement in his memorandum. (Pl. Resp. at 12.) Six days after Plaintiff's complaint, Lieutenant Jeffrey Smith in a memorandum recommending progressive disciple to Chief Gaskin stated:

> In reviewing [Plaintiff's] memorandum I am concerned due to her claim of discrimination and a hostile work environment. It seems as if she is attempting to shield herself from any disciplinary ramifications stemming from the incident on 01/22/08 and possibly lay a foundation for adverse legal action against the department.

(J. Smith Memo. at 4.) Plaintiff argues that this statement indicates a causal connection. (Pl. Resp. at 12.)

The Court does not find that there is a causal connection demonstrated between Plaintiff's complaint and her termination. There were eight weeks between Plaintiff's complaint and her suspension pending discharge. (Arbitration Op. at 2.) This lapse is sufficient to prevent the temporal connection alone from establishing a causal connection. The Court does not find that Lieutenant Jeffrey Smith's statement regarding Plaintiff's possible claim against the Department shows a connection between her complaint and the decision to terminate her employment.

### 4.      Defendants have articulated a legitimate, non-discriminatory reason

Assuming that Plaintiff satisfied her burden of proving a prima facie case of retaliation, the burden shifts to Defendants to articulate a legitimate, non-discriminatory

reason for the adverse employment action. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 573 (6th Cir. 2000). Defendants argue that there is a valid, non-discriminatory reason for Plaintiff's discharge, namely her refusal to change out of her red jacket. (Defs.' Mot. at 18.)

Defendants state that the decision to terminate Plaintiff's employment was for failure to cooperate and insubordination, coupled with a history of disciplinary actions. (Watkins Memo. at 2.) The Court finds that the Defendants have articulated a legitimate, non-discriminatory reason for Plaintiff's termination. *See Holden*, 793 F.2d at 753 (employee not protected under Title VII when disciplined for violating company policy).

### 5.   Even if Plaintiff has shown possible pretext, she fails to prove the prima facie case

Because Defendants have articulated a legitimate, non-discriminatory reason for terminating Plaintiff, the burden returns to Plaintiff to show that the reason was pretext. To show pretext the plaintiff can show "1) the stated reasons had no basis in fact; 2) the stated reasons were not the actual reasons; and 3) that the stated reasons were insufficient to explain the defendant's action." *Univ. of Cincinnati*, 215 F.3d at 573. "A reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *Id.* (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)).

Plaintiff argues that the asserted reason has no basis in fact because hers and Defendant Martin's versions of the jacket differ significantly, she was not belligerently insubordinate, and the order to wear a windbreaker in below freezing weather could not have motivated Defendants to discipline her. (Pl.'s Resp. at 10-11.) Plaintiff further

33

argues that the arbitrators' reversal of her termination decision and the characterization of the event by Lieutenant Kevin Smith show that the proffered reason was pretext.[15] (Pl.'s Resp. at 11.) Lieutenant Kevin Smith and Plaintiff stated that the brightness of the jacket is not a legitimate safety concern because the raid was taking place in the daytime. Plaintiff also stated that other members of the raid team were wearing non-standard issue jackets.[16] There is also a dispute over whether Defendant Martin ordered Plaintiff to wear the windbreaker or whether he told her she could not come on the raid.[17]

Plaintiff argues that her reinstatement to her employment shows that the insubordination charge lacked credibility. (Pl.'s Resp. at 13.) However Defendants argue that the reversal does not indicate pretext because the arbitrator thought that Defendant Martin validly ordered Plaintiff to change her jacket. (Defs.' Reply at 5.) The arbitrators reinstated Plaintiff because the original termination decision was based on an incorrect disciplinary record and because of other mitigating factors. (Defs.' Mot. at 5.)

Although the Court is inclined to say that there is a genuine issue of material fact regarding whether the reason for her termination is pretext, the issue is not dispositive because the Court finds that Plaintiff did not prove the prima facie case of retaliation. The Court therefore GRANTS Defendants' motion for summary judgment as to Plaintiff's retaliation claim.

---

[15] Lieutenant Kevin Smith described her termination as a "sham" (K. Smith Aff. at ¶ 7)
[16] Members of the team wore navy or blue jackets, a faded light blue denim jacket, and a leather jacket. (Kurth Dep. at 54, 55, 57)
[17] In Defendant's brief: "Detective Martin told her to put on the other jacket or not go to the raid (Defs.' Mot. at 1-2). In Plaintiff's Response: "Defendant Martin apparently took issue with [the coat] being red. He simply state that she was "not invited." The Arbitration Opinion and Award says both versions occurred. (Arbitration Op. at 5-6).

**C.   Plaintiff has failed to make a case of Intentional Infliction of Emotional Distress**

In her complaint, Plaintiff asserted that the Defendants' conduct constituted the intentional infliction of emotional distress.[18] (Pl.'s Compl. ¶ 39.) Defendants argue that this count should be dismissed because of a lack of evidence supporting this claim. (Defs.' Mot. at 3.) The Michigan Court of Appeals has recognized IIED as an actionable claim, and provides the following elements of a prima facie case: "(1) 'extreme and outrageous' conduct; (2) intent or recklessness; (3) causation; and (4) severe emotional distress." *Graham v. Ford,* 604 N.W.2d 713, 716 (Mich. Ct. App.1999) The extreme and outrageous conduct must "go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Id.*

Plaintiff has not alleged or raised any evidence that supports this claim. The Court therefore GRANTS Defendants' motion for summary judgment as to Plaintiff's intentional infliction of emotional distress claim.

**D.   Plaintiff's claims for a civil conspiracy and concert of action fail**

Defendants argue that Plaintiff's claims for conspiracy and concert of action should be dismissed under Fed. R. Civ. P. 12(b)(6). (Defs.' Mot. at 20.) Plaintiff states that both causes of actions are supported by Defendants Martin and Watkins' intention to terminate her employment and the baseless nature of her insubordination cause. (Pl.'s Resp. at 13; K. Smith Aff. at 7.) Plaintiff further states that their motives, whether discriminatory or not, are irrelevant. (Pl.'s Resp. at 13.) Defendant also argues that claim fails because of a lack of supporting evidence. (Defs.' Mot. at 20; H.R. Letter I; Arbitration Op.) Because both parties rely on evidence outside of the pleadings, this

---

[18] Plaintiff does not address this issue in her Response to Defendants Motion for Summary Judgment but because she raises it in her complaint, the Court addresses it.

Court construes the motion as one for summary judgment under Rule 56. *See* Fed.R.Civ.P. 12(d).

"A civil conspiracy is a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by criminal or unlawful means." *Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n.,* 670 N.W.2d 569, 580 (Mich. Ct. App. 2003) (quoting *Admiral Ins. Co. v. Columbia Cas. Ins. Co.,* 486 N.W.2d 351, 358 (Mich. Ct. App. 1992)), *aff'd* 693 N.W.2d 358 (Mich. 2005). "Conspiracy entails 'an agreement, or preconceived plan to do an unlawful act.' "*Cousineau v. Ford Motor Co.,* 363 N.W.2d 721, 731 (Mich. Ct. App. 1985) (citing *Bahr v. Miller Bros. Creamery,* 112 N.W.2d 463, 469 (Mich. 1961). Furthermore, in order to support a claim of conspiracy, it is necessary for the plaintiff to prove a separate, actionable tort. *Advocacy Org. for Patients & Providers,* 670 N.W.2d at 580 (citing *Early Detection Center, PC v. N.Y. Life Ins. Co.,* 403 N.W.2d 830, 836 (Mich. Ct. App. 1986)). "'Concert of action' cannot be the tort or unlawful action underlying a conspiracy claim." *Cousineau,* 363 N.W.2d at 730.

A plaintiff may recover under concert of action "if [he] can establish that all defendants acted tortiously pursuant to a common design." *Abel v. Eli Lilly & Co.,* 343 N.W.2d 164, 176 (Mich. 1984). "Concert of action is itself a claim which, like conspiracy, cannot exist independently of an underlying tortious act." *Cousineau,* 363 N.W.2d at 731 (Mich. Ct. App. 1985).

Plaintiff has not stated an underlying tort here. As discussed above, the tort of intentional infliction of emotional distress has been dismissed. Although Defendant has requested dismissal of Plaintiff's civil conspiracy and concert of action claims pursuant

36

to Rule 12(b)(6) and the Court is inclined to agree, the Court grants this motion on a different ground. Because Plaintiff has brought forth materials outside of the complaint, yet still fails to raise a genuine issue of material fact, the court treats Defendants' request as a request for summary judgment and dismisses the claim. The Court therefore GRANTS Defendants' motion for summary judgment as to Plaintiff's claims for civil conspiracy and concert of action.

## IV.    Conclusion

For the forgoing reasons, Defendants' motion for summary judgment should be GRANTED IN PART and DENIED IN PART. Specifically, Defendants' Motion is GRANTED with respect to Plaintiff's sex discrimination claims of hostile environment and disparate treatment, Plaintiff's retaliation claim, and Plaintiff's intentional infliction of emotional distress claim. Defendants' motion to dismiss Plaintiff's civil conspiracy and concert of action claim is GRANTED under summary judgment and not under Rule 12(b)(6). Defendants' Motion is DENIED with respect to Plaintiff's mixed motive claim.


s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  July 6, 2011July 11, 2011

I hereby certify that a copy of the foregoing document was served upon counsel of record on July 6, 2011July 11, 2011, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager